**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**


**JERRY S. MILLER,**

      **Plaintiff,**

**vs.**                                     **Case No. 5:05cv151-RS/WCS**

**MICHAEL J. ASTRUE,**[1]
**Commissioner of Social Security,**

      **Defendant.**

_____/


**REPORT AND RECOMMENDATION**

      This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

      Plaintiff, Jerry S. Miller, applied for disability insurance benefits and supplemental security income benefits. His insured status for disability insurance

---

      [1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007, and is automatically substituted as Defendant. FED. R. CIV. P. 25(d).

benefits did not expire until December 31, 2007.  R.  307.  Plaintiff was 42 years old at

the time of the third administrative hearing on March 5, 2007,[2] has a 12th grade

education, and has past relevant work as a farmer, a mechanic's helper, truck

mechanic, and tractor-trailer truck driver.  Plaintiff alleges disability due to injuries

primarily suffered from a motor vehicle accident on December 7, 2000.  Those injuries

include status post right hip fracture and dislocation and right facial trauma, both with a

subsequent open reduction internal fixation (ORIF) to repair the fractured bones,

cervical disc disease, and vision problems.

The Administrative Law Judge determined that Plaintiff has the residual

functional capacity for light work, but must avoid exposure to heights and dangerous

machinery, and cannot work in jobs that require bilateral visual acuity.  R.  311.  Relying

upon testimony from a vocational expert, the Administrative Law Judge found that while

Plaintiff can no longer do his past relevant work, he can perform the light unskilled jobs

of cafeteria attendant and housekeeper.  The ALJ concluded, therefore, that Plaintiff is

not disabled as defined by Social Security law.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  <u>Chester</u>

---

[2] Plaintiff filed his application on April 18, 2001.  Doc.  34, p.  2.  The first hearing was on July 29, 2003, resulting in denial of the application.  *Id.*  The Appeals Council remanded, and another hearing was held on February 8, 2005, again resulting in an unfavorable decision.  *Id.*, pp.  2-3.  The Appeals Council denied review, and the complaint was filed in this court on July 28, 2005.  *Id.*, p.  3 and doc.  1.  The audio record of the second hearing was inadequate, so the application was remanded for a third hearing.  Docs.  8 and 9.

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.CT. 1265, 1272, 152 L.Ed.2d 330 (2002).

        The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

    1.      Is the individual currently engaged in substantial gainful activity?

    2.      Does the individual have any severe impairments?

    3.      Does the individual have any severe impairments that meet or
            equal those listed in Appendix 1 of 20 C.F.R. Part 404?

    4.      Does the individual have any impairments which prevent past
            relevant work?

    5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Medical Evidence**[3]

On December 7, 2000, Plaintiff had a severe motor vehicle accident and was

admitted to the hospital.  R.  175.  Plaintiff was driving a tractor trailer (18 wheeler).  R.

212.  The accident occurred when a 4 wheeler fell from another truck, striking a second

truck and knocking an unsecured forklift from it.  The forklift crushed the cab of Plaintiff's

truck.  *Id.*  It was noted William Owen, Jr., M.D., Plaintiff's facial surgeon, that Plaintiff

"suffered a femoral fracture and a terribly crushed comminuted[4] fracture of the

zygoma[5] and orbit[6]."  R. 175.  Extensive reconstructive surgery was required.  R.

175-177.  The hip surgery was performed by Dr. Hall.  Dr. Owen had consultation with

Dr. John G. Hall, apparently an ophthalmologist.   R. 175-177, 242, 261.  Dr.  Hall

discharged Plaintiff on December 14, 2000.  R.  242.

---

[3] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.

[4] Comminuted means broken or crushed into small pieces.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[5]  The zygoma or zygomatic arch is part of the orbital bone of the skull below the eye.  MERRIAM-WEBSTER ONLINE, found at www.m-w.com .

[6] The bony cavity that contains the eyeball and its associated muscles, vessels, and nerves.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

On a follow-up treatment visit on December 21, 2000, Dr. Owen noted that Plaintiff had suffered "one of the worse mid face fractures, zygoma and orbital floor I have dealt with." R. 195. Plaintiff had diminished vision on the right, difficulty opening his jaw, and pain. *Id*.

On January 2, 2001, Dr. Owen noted that Plaintiff could barely open his jaw, and he had mild diplopia[7] on the right and [monopia] on the left. *Id*. He said that the right eye motion "actually looks very good." *Id*. Elavil[8] had been very helpful for pain. *Id*. Plaintiff was examined that same day by Dr. Fortin at Eye Center South. R. 261-262. Dr. Fortin thought that new glasses would clear up Plaintiff's vision problems. R. 262. Dr. Fortin said that the optic nerve was completely healthy. *Id*.

Plaintiff returned to Dr. Owen on January 16, 2001. R. 194. He looked better and said he was doing a "little better." *Id*. The swelling was "down considerably." *Id*. He still had jaw stiffness but not so much pain. *Id*. Plaintiff thought that his vision, with glasses, was not as good as it could be, but it was "certainly much better than it was." *Id*.

On January 18, 2001, Plaintiff was examined at Southern Bone & Joint Specialists, P.A., by Dr. Hall for his hip injury. R. 219-220. Dr. Hall noted that Plaintiff was "[s]tatus post fracture-dislocation of the right hip with Pipkin femoral head fracture

---

[7] Diplopia is the perception of two images of a single object, double vision. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[8] Elavil is an antidepressant with sedative effects; the active ingredient is amitriptyline HCL. PHYSICIANS' DESK REFERENCE (2005). Amitriptyline hydrochloride is a tricyclic antidepressant having sedative effects; it is also used for treatment of chronic pain. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

requiring internal fixation . . . ."  R. 219.  Plaintiff said it was painful to walk and bend his

right knee.  *Id*.  About 1/2 inch of atrophy was noted on the right quad side compared to

the left.  *Id*.  Radicular pain was noted into the arm upon rotation of the neck.  *Id*.  Dr.

Hall said that the most strenuous activity that Plaintiff could do was drive an automobile.

R. 220.  He thought that "[l]ong term implications of this injury are avascular[9] necrosis

and degenerative arthritis."  *Id*.

On March 29, 2001, Plaintiff still had right sided face and periorbital pain, and

parasthesias of the infraorbital nerve.  R. 194.  There was no surgical infection,

however.  *Id*.  It was possible that a sinus infection was causing the pain.  *Id*.  A CT

maxillofacial scan was done on April 6, 2001.  R. 192-193.  There was evidence of

fracture healing, and no evidence of sinusitis, but with "post traumatic deformity of the

posterior medical wall of the right maxillary antrum which cause an apparent narrowing

of the posterior maxillary sinus on the cornal view."  R. 192-193.  The fractures were

well-aligned.  R. 192.

On April 6, 2001, Plaintiff was seen by Dr. Dannemann, an eye specialist, with

complaints of a blind spot in one eye.  R. 260.

On April 9, 2001, Plaintiff was examined again by Dr. Hall.  R. 218.  Plaintiff

continued to have complaints of pain in the right knee (patellofemoral) secondary to a

dash board injury and left neck radiating into the left arm.  *Id*.  An x-ray of the neck was

normal, without evidence of soft tissue injury.  *Id*.  An x-ray of the knee was normal

"except for lateral tilt to the patella."  *Id*.  An x-ray of the right hip showed "healing of the

---

[9] Avascular means not supplied with blood vessels.  DORLAND'S ILLUSTRATED
MEDICAL DICTIONARY.

fracture in the inferior portion with some revascularization.  However, the apex at the jointline is not revascularized yet and is not considered healed."  *Id*.  A cervical epidural was ordered.  *Id*.  The quad atrophy and patellofemoral pain were to be treated with a brace and rehabilitative exercises.  *Id*.  Dr. Hall thought that the hip could be weight bearing "as tolerated."  *Id*.  He was not sure how well the hip would revascularize, and did not know to what extent Plaintiff would develop arthritis secondary to the accident.  *Id*.

Plaintiff against saw Dr. Hall on May 14, 2001.  R. 217.  Dr. Hall noted from x-rays that the right femoral head fracture showed "good healing" with "no evidence of avascularity of the medial fragment."  *Id*.  Plaintiff had completed his physical therapy program.  *Id*.  He had "regained full use of his shoulders and his quad girth seems symmetrical [without atrophy]."  *Id*.  Plaintiff had "some pain on internal and external rotation of extremes of hip motion."  *Id*.  Plaintiff was dismissed to a home exercise program.  *Id*.  Dr. Hall thought a follow-up in three months was indicated to check vascularity and arthritic changes, and thought Plaintiff "remains a candidate in the future for having problems with the hip and needing conversion to a total hip arthroplasty."  *Id*.  The neck pain was thought to be resolved with the first epidural.  *Id*.  A second epidural was ordered.  *Id*.

On July 10, 2001, Plaintiff was seen by Dr. Dannemann again, complaining of a blind spot, swelling, and difficulty reading with headaches.  R. 258.  Dr. Dannemann hoped that the problems would resolve on their own.  *Id*.

Dr. Hall again saw Plaintiff on September 11, 2001.  R. 215.  Plaintiff still had some pain with hip rotation extremes, but the primary pain complaint was about his arm.

*Id.*  The pain radiated from the neck to the elbow on the left side.  *Id.*  Plaintiff was

neurologically intact to motor, reflex, and sensory testing in his upper extremity,

however.  *Id.*  An x-ray showed excellent healing of the femoral head fracture.  *Id.*  he

was still at risk for needing a total hip replacement.  *Id.*  A cervical MRI was ordered

since "previous injections, physical therapy, anti-inflammatory medications and

epidurals have not been helpful."  *Id.*  The second cervical epidural had not afforded as

much relief as the first.  *Id.*

   The MRI of the neck was conducted on September 18, 2001.  R. 216.  It was

noted that there was "minimal ventral effacement of the thecal sac C5-6 and C6-7.  No

significant central canal stenosis or significant ventral effacement of the thecal sac

identified at the levels imaged."  *Id.*  It was noted that the vertebral body alignment was

normal, with a normal signal in the cervical cord.  *Id.*  Minimal bulges were noted at C8-

7 and C5-6.  *Id.*

   On September 25, 2001, Plaintiff was seen by Henry Barnard, II, M.D., at

Southern Bone & Joint Specialists.  R. 214.  Dr. Barnard said that Plaintiff "has had

really a remarkable recovery considering the magnitude of injury he sustained but he

has had persistent weakness in his left upper extremity that he's noticed ever since they

tried to get him up on a walker."  *Id.*  This manifested itself as generalized weakness

along with some numbness in the fourth and fifth fingers.  *Id.*  X-rays were reviewed and

did not show any "clear cut abnormalities."  *Id.*  Dr. Barnard's impression was that

Plaintiff probably had "a stretch injury to his cervical plexus."  *Id*.  He recommended EMG[10] nerve conduction velocities.  *Id*.

The EMG and nerve conduction velocity tests on September 28, 2001, produced normal results in Plaintiff's left upper extremity.  R. 213.  It was found that there was "no evidence of cervical radiculopathy, plexopathy or other mononeuropathies, or polyneuropathy."  *Id*.  Dr. Barnard reviewed these test results on October 3, 2001, and found them to be "essentially normal."  R. 212.  He concluded that a more significant problem requiring treatment had not been identified by the testing, that further testing was not indicated, and "continued observation" was recommended "unless something gets worse."  *Id*.

Plaintiff was not seen again at Southern Bone & Joint Specialists, P.C., until February 28, 2003.  R. 229-230.  He was seen by William B. Hanson, M.D.  *Id*.  Plaintiff reported to Dr. Hanson that he was:

> a machine operator and has been working for Allred for the past five or six months.  Basically he runs hydraulics and doesn't have to do a lot of heavy pushing, pulling, tugging and that sort of thing.

R. 229.  He complained of continued pain in the left shoulder girdle.  *Id*.  On examination, Plaintiff was "tender in the left trapezius trigger zone."  *Id*.  He had normal flexion and extension of the neck.  *Id*.  He could rotate his neck about 75 degrees left and right but this caused extreme pain.  *Id*.  He had a little weakness in the left triceps, but his biceps and triceps were equal in size.  *Id*.  Dr. Hanson noted that "X-rays of the

---

[10] Electromyography, that is, an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

cervical spine are within normal limits." *Id.*  It was thought that he had a stretch injury to the shoulder.  R. 229-230.  Dr. Hanson mused that the injury to Plaintiff's right side of his head, pushing the head to the left, would not be expected to stretch the nerve on the left shoulder.  R. 230.  An injection into the trapezius trigger zone was planned.  *Id.*  It was thought that if the pain persisted, another MRI and EMG might be ordered.  *Id.*

On March 12, 2003, Plaintiff saw Dr. Dannemann.  R. 252-254.  Retinal detachment of the right eye was found and laser surgery was planned.  R. 254, 238.  The surgery was performed on March 19, 2003, by Dr. Fortin.  R. 238.

On July 16, 2003, Plaintiff was seen by O. D. Mitchum, M.D.  R. 232.  He related his history following the motor vehicle accident.  *Id.*  Plaintiff reported that his memory of recent events was "poor, got better, worsening."  *Id.*  Dr. Mitchum wrote:

> Mr. Miller had brain damage, as well as many other injuries which has left him totally disabled.  His short-term memory is terribly poor.  He is virtually unemployable, in my judgement.  He cannot pass a DOT physical, and will never be able to.

R. 231.  There are no treatment notes from Dr. Mitchum in this record.

There are no other significant medical treatment records since 2003.  On December 6, 2006, Plaintiff was examined on a consultative basis by C. W. Koulisis, M.D.  R. 414-423.  Plaintiff complained of "nonspecific neck pain but denies any upper or lower extremity radiation."  R. 414.  Plaintiff also complained of "some right hip pain which is activity related."  *Id.*  Dr. Koulisis said that Plaintiff arose "without difficulty," and had "normal gait."  R. 415.  He found that Plaintiff's cervical region was negative on the

Spurling's test[11] without spasm, and motor strength was 5/5 (intact).  *Id.*  Reflexes and sensation were also normal.  *Id.*  Testing of the shoulders, elbows, and wrists were negative for abnormalities.  *Id.*  Plaintiff's thoracolumbar spine was without palpable spasm, motor strength was intact, sensation was intact, and there were no observable abnormalities.  *Id.*  Likewise, nothing abnormal was noted with Plaintiff's hips, knees, and ankles and feet.  *Id.*  Dr. Koulisis's impressions were that Plaintiff had recovered well from his injuries, and "specifically he has full range of motion of the hip, leg lengths are equal, rotation is correct."  R. 416.

Dr. Koulisis completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)."  R. 420-423.  He determined that Plaintiff's ability to lift, carry, stand, walk, sit, push, pull, climb, balance, kneel, crouch, crawl, and stoop were not limited by any impairment. R. 420-421.  He determined that Plaintiff had no limitations for seeing, hearing, or speaking.  R. 422.  He noted no environmental limitations.  R. 423.

**Evidence from the Administrative Hearing**

Plaintiff testified that his former steady work was driving a truck.  R. 450.  He was injured driving an 18 wheel tractor-trailer.  R. 175.

Plaintiff testified that he last worked for his father in 2005 doing farming work.  R. 448.  The farm grew grain, and the physical work was done by Plaintiff's father and

---

[11] This test is used for evaluation of cervical spine radiculopathy.  The patient laterally bends the neck to each side while maintaining a posture of cervical extension.  Pain intensified with ipsilateral bending strongly suggests a diagnosis of radiculopathy.  Pain with contralateral bending suggests musculo-ligamentous origin.  UNIVERSITY OF FLORIDA, COLLEGE OF MEDICINE, available at: http://www.med.ufl.edu/rheum/rheumTests.htm

brother.  R. 469.  He said he did not drive any of the heavy equipment, but instead, directed his father and brother as to what to do.  R. 470.  He provided consultation sometimes daily, sometimes weekly, sometimes monthly, depending on the crops.  R. 471.  He received $9,000 that year from this work and this was based upon the productivity of the crop.  *Id.*  Plaintiff said he worked in 2003 as a mechanic's helper, making about $8800.  R. 448-449.  He carried parts to other mechanics.  R. 448.  Plaintiff said that when he worked in 2002 or 2003, he was seated perhaps four hours a day and standing or walking four hours a day, carrying no more than 2 pounds.  R. 469.

Plaintiff testified that since the accident, he had had swelling "on the brain."  R. 452.  Plaintiff thought that this "definitely" affected his ability to concentrate.  *Id.*  He said he had a history of depression after the accident and was treated by "Dr. Amin."  *Id.*  Plaintiff said that his experience of depression now was "not as bad" because he had "found a way to deal with that." R. 453.

Plaintiff said his right eye, right side of his face, and right hip were "temperature sensitive."  R. 453.  He said this triggered swelling when it was hot.  *Id.*  Plaintiff said his vision in his right eye with glasses was 20:100.  R. 455.  He said he also sees double part of the time, and further corrective surgery was planned.  R. 459.  Plaintiff said he no longer drove a motor vehicle and could not read except with great difficulty.  R. 460-461.

Plaintiff said he could not walk any length of time due to his hip injury.  R. 456.  He said he could not carry things except for very light objects (under ten pounds) due to this injury.  R. 457.  Plaintiff said that the pain in his hip was constant, about 3-4 on a scale of 10.  R. 458-459.

Plaintiff said that his neck pain was also constant in the same range.  R. 463-464.  He said his left arm and hand experienced a burning sensation and it affected his ability to grip objects.  R. 464.

Plaintiff said he had help around the house from his mother, father, and sister, who live some distance away.  R. 465.  He lives with his six year old daughter.  *Id*.  His sister does house cleaning and shopping for him.  R. 466.  A neighbor checks on him and his daughter and cooks supper a lot for them.  *Id*.

Plaintiff said he had trouble sleeping due to pain.  R. 467.  He said he might get an hour and a half of sleep each night.  R. 468.  Plaintiff said he took Elavil for the damaged nerves in his face, especially in the summer, and he takes Motrin for pain in the joints.  R. 468-469.

The vocational expert testified that Plaintiff performed the job of mechanic's helper as light duty, and the job of farm adviser likewise was a light duty job.  R. 473.  The jobs of truck driver and truck mechanic required medium duty.  R. 472.

The vocational expert said that a person of Plaintiff's age and experience, with the assumed residual functional capacity to do light work, avoiding hazards, including heights and machinery, and unable to do jobs requiring excellent bilateral vision, could do work as a cafeteria attendant or housekeeper.  R. 474-479.  Such a person could not do any sedentary work.  R. 479.

If, however, all of Plaintiff's testimony was fully credited, then there are no jobs in the national economy that he might do.  R. 479.  These limitations would include pain in the right hip and right side of the face, reduced memory and concentration, declining eyesight, neck pain, numbness of the left arm and hand, and some depression.  *Id*.

At the conclusion of the hearing, counsel for Plaintiff argued that, in light of

Plaintiff's testimony concerning memory impairment, a consultative psychological

examination was needed.  R. 480.

**Legal Analysis**

 **Whether the Administrative Law Judge failed to follow this circuit's
 pain standard in considering Plaintiff's subjective testimony**

 Pain and other symptoms reasonably attributed to a medically determinable

impairment are relevant evidence for determining residual functional capacity.  Social

Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or

non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so.  *See Hale v.
> Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,
> that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for

disregarding the claimant's subjective pain testimony must be based upon substantial

evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain

standard if his findings "leave no doubt as to the appropriate result" under the law.

Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

"A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted).  "[W]here proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  Id. at 1562, quoting, Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

The ALJ in this case determined that Plaintiff's description of his symptoms and limitations was not fully credible.  He explained:

> [T]he objective medical evidence in the record fails to establish an underlying medical condition that could reasonably be expected to produce incapacitating limitation.  The medical evidence shows that following his accident in December 2000, the claimant underwent several surgical procedures.  By April 2001, it was noted that he had full range of motion and minimal pain.  When the claimant was evaluated in February 2003, he noted that he had been working for the last five or six months.  When Dr. Koulisis completed a consultative examination of the claimant in December 2006, he noted that the claimant had full range of motion in his hip.  Despite the claimant's allegations of depression, the evidence does not show treatment for the condition and the claimant indicated that his depression has improved.  Although the undersigned recognizes that the claimant has some degree of pain, the objective and other evidence simply does not establish that the pain is as disabling as the claimant alleges.
>
> The claimant's credibility is further diminished by his inconsistent statements regarding his activities of daily living that include multiple periods of performing substantial gainful activity and caring for his 6 year old daughter.  Such level of activity is not consistent with complete inability to work.

> No treating or examining physician has recently said that claimant is completely unable to work.  Little weight was given the opinion of Dr. Mitchum who indicated in July 2003, that the claimant's short term memory was poor and that the claimant was virtually unemployable.  This opinion was inconsistent with the claimant's treatment records and the fact that he later returned to work.  More weight was given the opinion of Dr. Koulisis who completed a Medical Source Statement of Ability to do Work-related Activities regarding the claimant.  In that, he indicated that the claimant had no exertional limitations.  This opinion is more consistent with the medical evidence of record. . . .

R. 313.

The ALJ correctly applied this circuit's pain standard and the reasons he gave for discounting Plaintiff's testimony are supported by substantial evidence in the record, fully set forth above.  Thus, his conclusions must be affirmed.

### Whether the Administrative Law Judge should have ordered a psychological or psychiatric consultative examination

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ."  Sims v. Apfel,  530 U.S. 103, 110-111, 120 S.CT. 2080, 2085, 147 L.Ed.2d 80 (2000), citing Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.CT. 1420, 28 L.Ed.2d 842 (1971).  "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a *basic* obligation to develop a full and fair record."  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (emphasis added), *citing*, Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  This basic duty exists whether or not the claimant is represented.  Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995) (citation omitted).  Additional evidence, however, is not necessary if the record contains sufficient evidence to make a decision.  Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).

"The Secretary has broad latitude in ordering a consultative examination." <u>Diaz v. Secretary of Health and Human Services</u>, 898 F.2d 774, 778 (10th Cir. 1990); <u>Reed v. Massanari</u>, 270 F.3d 838, 842 (9th Cir.  2001) (citing <u>Diaz</u>).  There is "no absolute duty under 42 U.S.C. § 421(h) for the Secretary or the ALJ to have a psychologist or psychiatrist complete the medical portion of the case review and the residual functional capacity assessment."  <u>Andrade v. Secretary of Health and Human Services</u>, 985 F.2d 1045, 1050 (10th Cir. 1993) (citing <u>Bernal v. Bowen</u>, 851 F.2d 297, 302 (10th Cir. 1988)).

In <u>McCall v. Bowen</u>, 846 F.2d 1317 (11th Cir. 1988), the Eleventh Circuit held that 42 U.S.C. § 421(h) (enacted in 1984) "appears to require a consultative examination on less evidence than may have been required previously."  846 F.2d at 1320.  That statute provides:

(h) Evaluation of mental impairments by qualified medical professionals

An initial determination under subsection (a), (c), (g), or (i) of this section that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Commissioner of Social Security has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

42 U.S.C. § 421(h).

In <u>McCall</u>, the court noted that:

plaintiff's physicians have at times suggested that she might be suffering from a psychological condition. They have informed her that she suffered from "anxiety and nerves and a lot of stress," they have commented that she was "somewhat apprehensive," and they have prescribed Valium for her anxiety.

*Id.*  The court remanded for other reasons, but asked the Commissioner to carefully

consider the applicability of § 421(h).  *Id.*

In <u>Sneed v. Barnhart</u>, 214 Fed.Appx. 883 (11th Cir. Dec 22, 2006) (not selected

for publication in the Federal Reporter, No. 06-12693), the only evidence of a mental

impairment before the ALJ was the following:

> Specifically, Sneed testified that she was tearful and that she was on
> Zoloft, which is an antidepressant.  Medical records indicate that she was
> also on Xanax, which treats anxiety, and that she had a "fair prognosis"
> from her diagnosis of depression.

*Id.*, at 886.  The Eleventh Circuit said that "[t]hese brief references to depression, which

was apparently being treated with medication, were insufficient to trigger the ALJ's duty

to obtain a psychological consultative report."  *Id.*  While this is not binding precedent, it

is persuasive authority from our circuit.

In <u>Andrade</u>, there was evidence that the claimant had been provided intense

psychotherapy for four months before the hearing, and his treating physician expressed

the opinion that he was disabled due to mental impairment.  *Id.*, at 1048.  The court

concluded that the ALJ erred by not obtaining a consultative mental health evaluation.

*Id.*, at 1050.  Similarly, in <u>Hill v. Sullivan</u>, 924 F.2d 972 (10th Cir. 1991), a psychiatrist

had found that the claimant had chronic fatigue, which was "more likely" "chronic mental

depression."  *Id.*, at 974.  A witness for the claimant had testified that the claimant was

tired all the time and fell asleep frequently.  *Id.*  The court held that the ALJ erred by not

obtaining a consultative mental health evaluation.  *Id.*, at 975.

The case at bar is much more like <u>Sneed</u> than <u>Andrade</u>.  There is no evidence of

that Dr. Mitchum was a treating physician for brain injury or for any other mental

impairment.  Therefore, there is no basis to accord his opinion the weight to be given a treating physician.[12]  Further, even if he were a treating physician, Dr. Mitchum's conclusion that Plaintiff has brain damage is not supported by objective testing or a lengthy history of examination and medical notes.  This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  Further, that Plaintiff was able to be substantially gainfully employed as a farm consultant in 2005 contradicts Dr. Mitchum's opinion, rendered in 2003.  Finally, Plaintiff admitted that he was better able now to cope with depression.  Thus, it was not error for the Administrative Law Judge to have failed to obtain a consultative mental examination.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and are based upon substantial evidence in the record.  The decision of the Commissioner should be affirmed.

---

[12] The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence.  Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on February 6, 2008.


**s/   William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**